COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-407-CV

 

 

IN THE INTEREST OF A.C., JR., A CHILD                                                 

 

 

 

                                              ------------

 

             FROM THE 89TH
DISTRICT COURT OF WICHITA COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








Appellant Carol[2]
appeals from the trial court=s order
terminating her parental rights to her son, Abraham.  In three points, she complains about the
trial court=s sua sponte severing the
petition in intervention filed by one of Abraham=s former
foster parents, and in a fourth point, she claims that the trial court=s
finding that termination was in Abraham=s best
interest is factually insufficient.  We
affirm.

                                      I.  Background Facts

The Department of Family and
Protective Services (DFPS) removed two-year-old Abraham from his mother=s care
because it was concerned that she was not properly treating an MRSA[3]
infection in his leg bone for which he had been prescribed at-home intravenous
antibiotics.  A nurse at Cook Children=s
Hospital in Fort Worth had called DFPS after Carol failed to take Abraham to
two follow-up appointments regarding his leg and after a home health care
service that had been assisting Carol with Abraham reported that Abraham had
developed an infection in his IV=s
central line.

When the DFPS investigator arrived at Carol=s
then-current residence, Abraham was not able to support any weight on the leg,
could only walk by dragging the side of his foot on the injured leg, and was
not wearing any protective covering on the leg. 
Carol told the investigator that she had missed the appointments at Cook
Children=s
because her transportation fell through.[4]








The investigator took Carol and Abraham to the
emergency room at United Regional Hospital in Wichita Falls; the hospital sent
Abraham to Cook Children=s in Fort Worth the next day via
CareFlite.  According to the DFPS
investigator, Abraham had a severe infection in his leg bone and was on the
verge of losing his leg and becoming septic. 
Abraham=s medical records indicate that Carol
had failed to give Abraham twelve doses of his IV antibiotics at home.[5]

Abraham stayed at Cook Children=s for
approximately three months.  Carol stayed
with him during that time.  Medical
records from the beginning of Abraham=s stay
indicate that Carol suffered from migraines; that she slept in late with
Abraham, sat on a chair in his room, and did not play with him; and that she
did not supervise him adequately, allowing him to walk on his leg without his Aboot@ and
climb on a wheelchair in the room, and failing to put him in his crib when she
left the room so that he would follow her. 
However, later medical record entries show that after Carol received
pain medication and medical treatment, she became more engaged with Abraham.








Before Cook Children=s
discharged Abraham, DFPS filed a removal petition in Wichita County.[6]  It alleged that Abraham would require
long-term oral antibiotic therapy, have to wear a cast and boot, and need
continued follow-up visits to Cook Children=s.[7]  Because of Carol=s past
problems with caring for Abraham=s
condition[8]
and her inability to obtain transportation to Fort Worth, DFPS alleged that Carol
could not adequately care for Abraham=s
medical needs upon his discharge from the hospital.  The trial court signed an order naming DFPS
Abraham=s
temporary sole managing conservator.[9]  DFPS placed Abraham with Dorothy, a foster
parent who was licensed to care for children with special medical needs.[10]  It also developed a service plan for Carol,
which the trial court incorporated into temporary orders.








The trial court initially set a termination
hearing for March 31, 2008, almost one year after Abraham=s
removal on April 5, 2007.  See
Tex. Fam. Code Ann. ' 263.306(a)(12) (Vernon
2008).  But after the State moved to
extend the dismissal deadline, the trial court extended the dismissal date to
October 4, 2008, one year and one hundred eighty days after Abraham=s
removal.  See id. ' 263.401(a).

Dorothy[11]
filed a petition in intervention on July 17, 2008.  She alleged that her interests were aligned
with DFPS, and she sought termination of both parents= rights,
and, in the alternative, that she be named Abraham=s
permanent managing conservator.  The
trial court set a hearing on the petition in intervention for September 30,
2008 but also ordered the parties, including Dorothy, to mediate before the
hearing.  It is unclear from the record whether
the mediation actually occurred.








The trial court then transferred the case to the
appointed associate judge for the newly-created AChild
Welfare Court@ for Wichita County.  At the scheduled September 30 hearing on the
petition in intervention, the associate judge allowed the intervention and
proceeded to hear the termination case. 
However, during the DFPS caseworker=s testimony,
the associate judge realized that the attorney general=s office
in Wichita Falls, for whom she had previously worked, had participated in the
case with respect to the alleged father=s child
support obligations.  Accordingly, the
presiding judge of the 89th District Court, in which the case had originally
been filed, rescinded the transfer order and continued the termination trial
until October 3, a Friday, the next-to-last day before the one-year deadline.[12]

Before beginning the proceedings on October 3,
2008, the trial court announced,

I=ve reviewed the
file.  I=ve reviewed the medical
records.  I reviewed a good portion of
the [DFPS] records.  I=ve come to the conclusion
that we can try the termination part of this lawsuit without prejudice to the
intervenor in this matter.  And, in fact,
there=s a possibility we can
even pick up B if the notice is okay on
it B with continuation of
getting into the intervention as early as next week, if our trial docket falls
through.

 

I fail to see where any party would be prejudiced by doing this, and I
think that in the interest of justice in getting to the bottom of this with
[DFPS=s] claims and those of
the other parties, and in the absolute best interest of [Abraham], that I am
severing out [sua] sponte the intervention of
[Dorothy] . . . .

 








Carol=s
counsel objected on due process grounds, claiming a lack of notice and the
opportunity to be heard and further arguing that the court could not sever the
case so close to trial.  Counsel
additionally claimed that Dorothy was a necessary party because the court could
decide to name Carol a joint managing conservator or possessory conservator
along with her.  See Tex. R. Civ.
P. 41.  Dorothy objected on the ground
that she was a necessary party; in other words, both Carol and Dorothy claimed
that the trial court could not decide to terminate Carol=s
parental rights or allow Carol some kind of visitation, possession, or
conservatorship without Dorothy being a party to the case.  The trial court overruled the objections and
trial began.

After hearing all the evidenceCincluding
Dorothy=s
testimony that if she were named Abraham=s
managing conservator, she would allow Carol and Abraham=s
siblings to have supervised visitationCthe
trial court terminated both parents= rights
to Abraham and named DFPS Abraham=s
permanent managing conservator.  But it
also ordered that Carol be allowed twice monthly supervised visits with Abraham
for up to two hours each visit.  The
court noted,








[A]ll of this is without any kind of prejudice to any further rulings
or any further parties, specifically, the intervention, and the question as to
the possible adoptive parents. . . .  I
did not intend to deal with that issue today. 
The evidence [that] was offered and proffered into evidence, I=m certain will be offered
at the time the intervention portion is tried. 
And that can come about at any time that you-all can get time with the
Court, and notice to the parties.

 

Carol filed a motion for new trial, which the
trial court denied.  Only Carol appealed
from the trial court=s order.

                  II.  Propriety of Severance of Petition in
Intervention

Carol=s first
three points challenge the propriety of the intervention on three grounds:  (1) that the severance violated her
Fourteenth Amendment due process rights because of a lack of notice and
opportunity to be heard; (2) that the severance violated her Fourteenth
Amendment due process rights because her and Dorothy=s
positions were Ainterwoven, consistent and
supportive of each other@; and (3) that the trial court
abused its discretion by severing because Dorothy was a necessary and
indispensable party to the litigation.

A.  Applicable Law

Rule of civil procedure 41 reads, in pertinent
part:

Parties may be dropped or added, or suits filed separately may be
consolidated, or actions which have been improperly joined may be severed and
each ground of recovery improperly joined may be docketed as a separate suit
between the same parties, by order of the court on motion of any party or on
its own initiative at any stage of the action, before the time of submission to
the jury or to the court if trial is without a jury, on such terms as are just.  Any claim against a party may be severed and
proceeded with separately.

 

Tex. R. Civ. P. 41 (emphasis added).








A severance splits a single suit into two or more
independent actions, each action resulting in an appealable final
judgment.  Van Dyke v. Boswell,
O'Toole, Davis & Pickering, 697 S.W.2d 381, 383 (Tex. 1985); Aviation
Composite Techs., Inc. v. CLB Corp., 131 S.W.3d 181, 188 (Tex. App.CFort
Worth 2004, no pet.).  Severance of
claims under the Texas Rules of Civil Procedure rests within the sound discretion
of the trial court.  Liberty Nat=l Fire
Ins. Co. v. Akin, 927 S.W.2d 627, 629 (Tex. 1996) (orig.
proceeding); Aviation Composite Techs., 131 S.W.3d at 188.  A claim is properly severable if (1) the
controversy involves more than one cause of action, (2) the severed claim is
one that would be the proper subject of a lawsuit if independently asserted,
and (3) the severed claim is not so interwoven with the remaining action that
they involve the same facts and issues.  Guar.
Fed. Sav. Bank v. Horseshoe Operating Co., 793 S.W.2d 652, 658 (Tex. 1990)
(op. on reh=g); Aviation Composite Techs.,
131 S.W.3d at 188.  The controlling
reasons for a severance are to do justice, avoid prejudice, and further
convenience.  Guar. Fed. Sav. Bank,
793 S.W.2d at 658; Aviation Composite Techs., 131 S.W.3d at 188.








A trial court is not required to provide prior
notice of its intent to sever, and, in most cases, it need not hold an evidentiary
hearing before severing.  Aviation
Composite Techs., 131 S.W.3d at 187B88; see
WorldPeace v. Comm=n for Lawyer Discipline, 183
S.W.3d 451, 461 n.11 (Tex. App.CHouston
[14th Dist.] 2005, pet. denied).[13]

B.     Analysis

Here, the trial judge was faced
with a looming section 263.401 dismissal deadline when he had to retake the
case from the associate judge.  Tex. Fam.
Code Ann. ' 263.401.  He was left with one day to try the
case.  Thus, it is clear from the record
that his decision to sever the intervention was made in light of those
scheduling constraints.








Although Dorothy=s petition
states that she is aligned with DFPS and seeking termination and eventual
adoption or permanent managing conservatorship, Carol=s
counsel informed the trial court, and Dorothy later testified, that she would
have no objection to Carol having visitation. 
Thus, Carol based her objection to the severance at trial onCand
urges on appealCthe ground that Dorothy=s wishes
that Carol have visitation had bearing on whether termination would be in
Abraham=s best
interest.  It is not clear from the
record, however, that Dorothy had entirely abandoned her claim for adoption.  Thus, the intervention clearly had at least
two distinct claims:  for permanent
managing conservatorship and, in the event of termination, adoption.

Additionally, Dorothy was able to testify at
trial about her background and qualifications, why Abraham was removed from her
home, and her wishes for Carol, Abraham, and Abraham=s
siblings to have contact in the future. 
In fact, the trial court ordered post-termination supervised visitation
for Carol.

Dorothy had standing to intervene because of her
possession of Abraham for a twelve-month period ending not ninety days before
the filing of the intervention.  See
Tex. Fam. Code Ann. ' 102.003(a)(12) (Vernon
2008).  Thus, she also had standing to
maintain her own suit.  See id.; In
re N.L.G., 238 S.W.3d 828, 829 (Tex. App.CFort
Worth 2007, no pet.).








Moreover, the severed claims were not so
interwoven with the termination suit that they could not be tried
separately.  The trial court was
effectively able to try the termination part, hearing evidence as to the
propriety of either retaining Carol as a possessory conservator or terminating her
rights.  Nowhere was unsupervised
visitation between Carol and Abraham advocated, including by Dorothy.  The trial court also heard evidence as to the
propriety of a future placement of Abraham with Dorothy.  The court told the parties that it intended
to try the adoption issues as soon as possible. 
And, although the trial court stated that it anticipated the parties
would introduce much of the same evidence that it had heard in the termination
proceeding, the fundamental issues are ultimately different.  Evidence that Abraham was adoptable by either
Dorothy or the then-current foster family, or that Dorothy was willing to allow
Carol supervised visitation, went to the issue of whether Carol=s
parental rights should be terminated. 
But evidence as to which of the two adoptive placements would be
ultimately in Abraham=s best interest was not
necessary to determine the impact of Carol=s having
continued parental rights in light of her inability to provide Abraham a
stable, permanent home environment.  See
Tex. R. Civ. P. 41; cf. Tex. R. Civ. P. 39(a) (requiring joinder if
disposition of action in party=s absence
would result in substantial risk of existing parties incurring inconsistent
obligations).








Accordingly, we conclude and hold that the trial
court did not abuse its discretion by severing Dorothy=s petition
in intervention and that the severance did not harm Carol.  See Tex. Fam. Code Ann. ' 162.001(b)(1)
(Vernon 2008) (providing that termination is required for child to be adopted);
cf. In re A.G.C., 279 S.W.3d 441, 448 (Tex. App.CHouston
[14th Dist.] 2009, no pet.) (holding that termination via affidavit of
relinquishment is not available only in anticipation of adoption, reasoning, in
part, that termination and adoption chapters of family code are separate); Hunter
v. NCNB Tex. Nat=l Bank, 857
S.W.2d 722, 725B26 (Tex. App.CHouston
[14th Dist.] 1993, writ denied) (holding that trial court had discretion to
sever claims involving trust=s
alleged ownership interest in home from declaratory judgment claim regarding
appellant=s alleged homestead interest in
home because homestead rights had to be determined regardless of whether house
belonged to trust or guardianship estate of appellant=s
mother).  Furthermore, because prior
notice and an evidentiary hearing are not required, and because Carol was given
the opportunity to be heard on her objections, we conclude and hold that her
due process rights were not violated.  We
overrule her first three points.

                                    III.  Best Interest Finding

In her fourth point, Carol challenges the factual
sufficiency of the trial court=s
finding that termination of her parental rights was in Abraham=s best
interest.

A.  Standard of Review and
Applicable Law








A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b) (Vernon Supp. 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20B21; In re M.C.T., 250
S.W.3d 161, 167 (Tex. App.CFort
Worth 2008, no pet.).








Termination decisions, including the best
interest finding, must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. '' 161.001,
161.206(a).  Evidence is clear and
convincing if it Awill produce in the mind of the
trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established.@ 
Id. ' 101.007 (Vernon 2002).  Due process demands this heightened standard
because termination results in permanent, irrevocable changes for the parent
and child.  In re J.F.C., 96
S.W.3d 256, 263 (Tex. 2002); see In re J.A.J., 243 S.W.3d 611,
616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for factual
sufficiency, we must give due deference to the factfinder=s
findings and not supplant the judgment with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether,
on the entire record, a factfinder could reasonably form a firm conviction or
belief that termination of the parent-child relationship would be in the best
interest of the child.  C.H., 89
S.W.3d at 28.  If, in light of the entire
record, the disputed evidence that a reasonable factfinder could not have
credited in favor of the finding is so significant that a factfinder could not
reasonably have formed a firm belief or conviction in the truth of its finding,
then the evidence is factually insufficient. 
H.R.M., 209 S.W.3d at 108.

There is a strong presumption that keeping a
child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child=s best interest.  Tex. Fam. Code Ann. '
263.307(a) (Vernon 2002).  The following
factors should be considered in evaluating the parent=s
willingness and ability to provide the child with a safe environment:

(1) the child=s age and physical and
mental vulnerabilities;

 

(2) the frequency and nature of out‑of‑home placements;








(3) the magnitude, frequency, and circumstances of the harm to the
child;

 

(4) whether the child has been the victim of repeated harm after the
initial report and intervention by DFPS or other agency;

 

(5) whether the child is fearful of living in or returning to the
child=s home;

 

(6) the results of psychiatric, psychological, or developmental
evaluations of the child, the child=s parents, other family members, or others who
have access to the child=s home;

 

(7) whether there is a history of abusive or assaultive conduct by the
child=s family or others who
have access to the child=s home;

 

(8) whether there is a history of substance abuse by the child=s family or others who
have access to the child=s home;

 

(9) whether the perpetrator of the harm to the child is identified;

 

(10) the willingness and ability of the child=s family to seek out,
accept, and complete counseling services and to cooperate with and facilitate
an appropriate agency=s close supervision;

 

(11) the willingness and ability of the child=s family to effect
positive environmental and personal changes within a reasonable period of time;

 

(12) whether the child=s family demonstrates adequate parenting skills,
including providing the child and other children under the family=s care with:

 

(A) minimally adequate health and nutritional care;

 








(B) care, nurturance, and appropriate discipline consistent with the
child=s physical and
psychological development;

 

(C) guidance and supervision consistent with the child=s safety;

 

(D) a safe physical home environment;

 

(E) protection from repeated exposure to violence even though the
violence may not be directed at the child; and

 

(F) an understanding of the child=s needs and capabilities; and

 

(13) whether an adequate social support system consisting of an
extended family and friends is available to the child.

 

Id. ' 263.307(b); R.R.,
209 S.W.3d at 116.

 

Other, nonexclusive factors that the trier of
fact in a termination case may use in determining the best interest of the
child include:

(A)    the
desires of the child;

 

(B)    the emotional and physical needs of the
child now and in the future;

 

(C)    the emotional and physical danger to the
child now and in the future;

 

(D)    the parental abilities of the individuals
seeking custody; 

 

(E)    the programs available to assist these
individuals to promote the best interest of the child;

 

(F)     the plans for the child by these
individuals or by the agency seeking custody;








 

(G)    the stability of the home or proposed
placement;

 

(H)    the acts or omissions of the parent which
may indicate that the existing parent‑child relationship is not a proper
one; and

 

(I)     any excuse for the acts or omissions of the
parent.

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976).

 

These factors are not exhaustive.  Some listed factors may be inapplicable to
some cases; other factors not on the list may also be considered when
appropriate.  C.H., 89 S.W.3d at
27.  Furthermore, undisputed evidence of
just one factor may be sufficient in a particular case to support a finding
that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

B.  Application of Factors to Evidence








DFPS=s main
concern about Carol was that she had failed to demonstrate that she could
provide a stable home and permanence for Abraham, which his caseworker and the
CASA advocate testified he needed most. 
Abraham was two at the time of his removal and almost four when Carol=s rights
were terminated.  Although his leg was
doing well and he had been able to wear two shoes for the first time since his
infection, he still had physical needs to be addressed, and there was still a
chance he would have to have additional surgeries.  He still had follow-up doctor=s
visits.  The CASA advocate and DFPS
caseworker both testified that Abraham=s need
for permanence was paramount.

Although Abraham had never been removed from
Carol=s care
before[14]
and did not need to remain on IV antibiotics when he left the hospital, DFPS
nevertheless petitioned for removal because of Carol=s past
neglect and the severity of the infection that led to him being admitted to the
hospital.  Before he was admitted, he was
in danger of becoming septic and losing his leg, and he had to be sent to Cook
Children=s via
CareFlite from the Wichita Falls emergency room.  The DFPS investigator testified that despite
this, Carol told her at the time that Abraham was doing ok.  Carol admitted that when her friend who was
going to drive her to Cook Children=s for
Abraham=s
followup visits went to jail, she still had the money Medicaid had given her
for transportation, but she said she could not get anyone else to take
her.  When asked about the bus, she said
they wouldn=t allow Abraham on the bus
because of his health condition.  Carol
did not keep in contact with Abraham=s
doctors.  DFPS was concerned because she
had not demonstrated an understanding of how important Abraham=s
followup care was.








The evidence showed that Carol was a chronic
marijuana user, which she acknowledged. 
She admitted smoking marijuana when she was pregnant with Abraham and
another of her children.  Carol failed at
least one drug test required by her service plan and refused to take
another.  In fact, her drug use led to
her probation being revoked while Abraham was in DFPS=s care;
she was not able to visit Abraham for the two months she was in jail.  Carol told DFPS she had been going to a
treatment facility before trial, but she did not provide any proof of her
attendance, and the center would not confirm whether she had been
attending.  The CASA advocate testified
that narcotics use can affect a person=s
ability to parent by affecting judgment, motivation, and motor skills. 








Between the time of removal and trial, Carol had
lived in four different places:  her aunt=s house,
the Budget Inn,[15]
a rental house, and the Deluxe Inn.  She
acknowledged that the motels were not safe for her children but said these
places were all she could afford.[16]  Carol testified that she had been working at
Sonic for eight months and that she made $260 per month after she paid child
support.  Although there was some
testimony that Abraham=s father was at the house when a
DFPS worker came by one time, there is no evidence about whether he lived with
the family or provided any support. 
Abraham=s father told the DFPS worker
that he did not want anything to do with the case. 

Abraham was in DFPS=s
custody for eighteen months.  While
Abraham was in DFPS=s custody, Carol failed to
maintain regular contact with him.  She
testified that she made about thirteen visits. 
According to Carol, she could not make every visit because of her other
children.  But the DFPS caseworker
testified that DFPS provided Carol with transportation and that Carol was
allowed to bring the other children. 
According to the caseworker, between November 2007 and the time of trial
on October 3, 2008, Carol visited Abraham four times, once on the day before
trial.  The CASA advocate testified that
the inconsistency of Carol=s visits
was harmful to Abraham.

There were no psychological test results
introduced at trial.  Carol had failed to
attend the counseling appointments and take the psychological tests recommended
in her service plan.  She acknowledged at
trial that she had failed to do so.








Carol also failed to attend any parenting classes
as required by her service plan.  DFPS
was concerned that she did not know how to meet Abraham=s
medical and emotional needs, as evidenced by the need for Abraham=s
admission to Cook Children=s, Carol=s
failure to visit him regularly when he was in DFPS=s
custody, and her failure to complete her service plan.  The CASA advocate testified that neither
parent had demonstrated that he or she understood parenting.  The DFPS caseworker agreed, however, that
Carol was young and immature and that people can mature over time.

No evidence indicated that Carol or the children=s father
had been assaultive toward Abraham or his siblings.  But the removal petition alleged, and the
caseworker referred to in her testimony, that Carol had a prior history with
DFPS.  The results of that history were
not introduced.

Carol testified that Abraham told her he wanted
to come home.  But the caseworker
testified that Abraham cried during at least one of Carol=s visits.  She also testified that it appeared Carol and
Abraham no longer had a bond.  The CASA
advocate testified that they appeared uncomfortable and did not interact very
much; Carol tried but she gave up when Abraham acted indifferently toward her
and chose to play independently.  She
also testified, however, that Abraham would interact with his siblings.

The caseworker testified that Carol had referred
a potential placement for Abraham to her but that the woman was not suitable
because she had a prior DFPS history. 
Additionally, a relative of the father=s called
and asked about the case, but Athat was
it.@  That relative had a prior history too.  According to the caseworker, there were no
other potential placements from the father=s
family. 








Dorothy testified that she had cared for
twenty-two children through DFPS.  She
was a licensed vocational nurse; sometimes DFPS would place children with
significant medical issues with her.  She
testified that Carol was very nice and sweet and that she visited Abraham about
once a month.  According to Dorothy, she
witnessed Carol=s interaction with Abraham
during the visits, and she and Abraham became less attached as Abraham became
more attached to Dorothy.  However, she
also testified that Abraham Anever
forgot@ his
sisters.

Dorothy testified that she had no problem with
Carol and Abraham=s siblings having supervised
visits with Abraham.  She had an adopted
daughter, and she allowed her to see her biological mother and siblings.  She believed Abraham needs to see his
siblings, especially because Abraham and his family are African-American, and
Dorothy and the foster parents with whom Abraham was currently placed are Caucasian.








At the time of trial, Abraham was living with
foster parents who also wanted to adopt him. 
He had been placed with the family after DFPS removed him from Dorothy=s care.[17]  The caseworker testified that Abraham had
prospered in their care and that his behavior had dramatically improved.  His manners, speech, and listening skills had
all improved, and he was showing less defiance. 
The foster parents were able to meet Abraham=s
physical and emotional needs; they also provided a stable home and
environment.  He called the foster
parents mom and dad and was very loving with them.








The CASA advocate testified that termination of
Carol=s
parental rights and adoption were in Abraham=s best
interest.  The caseworker agreed,
testifying that giving Carol possessory conservatorship would not be in Abraham=s best
interest because of his age and need for stability and because of Carol=s demonstrated
inability to parent.  According to the
caseworker, if Carol were awarded possessory conservatorship, the visitation
schedule would become more complicated, and it would impact Abraham=s sense
of permanency if Carol failed to visit on a regular basis.  However, the DFPS caseworker and
investigator, as well as Dorothy, all agreed that giving Carol supervised
visitation would alleviate DFPS=s
concerns about medical neglect.  The
caseworker also testified in response to cross-examination that supervised
visitation would alleviate Aall
concerns@ and
that it would be better for a child to have some contact with a parent than
none at all.  However, she qualified her
answer by stating that it could emotionally scar Abraham if Carol were to
continue to miss visits.  She was
concerned that Carol would not visit in the future because she had not visited
in the past.  She agreed, however, that
it was good for Abraham to have continued contact with his siblings.

C.     Analysis








Based on the above evidence, and applying the
best-interest factors, we conclude and hold that the trial court could
reasonably have formed a firm conviction or belief that termination of the
parent-child relationship would be in Abraham=s best
interest.  Although it was not disputed
that contact between Abraham and Carol and Abraham and his siblings would
benefit Abraham, it was likewise undisputed that it would be emotionally
harmful to Abraham if Carol failed to maintain that contact on a regular basis.  DFPS=s plans
for Abraham included permanent placement, and there were two potential options
for adoption.  Carol=s home
and financial situation never stabilized over the eighteen-month period when
Abraham was removed from her custody, and she did not have the support of
Abraham=s father
or, apparently, any other suitable family members to assist her in establishing
the kind of stability Abraham needed. 
Likewise, she continued to use marijuana and failed to visit with
Abraham on a regular basis.  In other
words, she continued to demonstrate a lack of parenting skills in the same vein
as her lack of attention to Abraham=s
medical condition for which he was initially removed.  See Tex. Fam. Code Ann. ' 263.307(b)
(Vernon 2008); Holley, 544 S.W.2d at 371B72; In
re K.C., 219 S.W.3d 924, 931 (Tex. App.CDallas
2007, no pet.) (AThe State=s
interest in establishing a >stable,
permanent home= is >compelling,= and a
parental‑rights termination, when grounds authorizing it are met, serves
that goal by permitting adoption.@).  Accordingly, we overrule Carol=s fourth
point.

IV. 
Conclusion

Having overruled all of Carol=s
points, we affirm the trial court=s
judgment.

 

TERRIE
LIVINGSTON

JUSTICE

 

PANEL:  LIVINGSTON, DAUPHINOT, and GARDNER, JJ.

 

DELIVERED:  June 25, 2009

 











[1]See Tex. R. App. P. 47.4.





[2]For purposes of
maintaining confidentiality, we will refer to all parties by fictitious
names.  See Tex. R. App. P. 9.8;
Tex. Fam. Code Ann. ' 109.002(d) (Vernon
2008).





[3]MRSA stands for
methicillin resistant staphylococcus aureus, or antibiotic resistant staph.





[4]Carol and Abraham lived
in Wichita Falls.  At the time of trial,
Carol had never owned a car and did not have a driver=s license.  Although Carol had received money for
transportation from Medicaid, she said she missed at least one appointment
because the woman who was supposed to take them had been jailed and she could
not secure other transportation.





[5]The DFPS investigator had
asked Carol for all the medication when she took Abraham and Carol to United;
Carol gave her several unopened boxes and an opened box of IV bags.





[6]The petition states that
reunification was DFPS=s goal but also pled in
the alternative for termination of both Carol=s and Abraham=s alleged father=s parental rights.





[7]The infection had gotten
so severe that it caused several fractures in Abraham=s leg bone.





[8]DFPS also alleged that it
had received prior referrals for Carol regarding medical neglect of two of her
other children and that Abraham had been born with marijuana in his system.





[9]Carol was not married to
Abraham=s alleged father, and it
is not clear from the record whether he and Carol lived together on a
consistent basis.





[10]Abraham had bone graft
surgery on April 24, 2008.  He also had
to wear a bone stimulator.





[11]Dorothy is the first
foster parent with whom Abraham was placed. 
DFPS removed Abraham from her home after she left Abraham with a
babysitter who failed to properly supervise him.





[12]An email in the clerk=s record notes, ABECAUSE OF THE DROP DEAD
DATE OF 10-04-08 WE HAVE CANCELED EVERYTHING FOR 10.03.08 AND THE CASE HAS BEEN
RESET TO FRIDAY 10-03-08 TO BEGIN AT 8:30 AM.@





[13]The cases Carol cites to
support her contention that Aa trial court cannot make a decision to sever a
matter simply on the live pleadings@ are inapposite. 
Two involve insurance companies opposing a trial court=s refusal to sever
first-party contractual and bad faith claims without first hearing evidence of
prejudice, a potential fact issue related to severance in those particular type
of cases.  See, e.g., Allstate Ins.
Co. v. Hunter, 865 S.W.2d 189, 194 (Tex. App.CCorpus Christi 1993,
orig. proceeding); Progressive County Mut. Ins. Co. v. Parks, 856 S.W.2d
776, 780 (Tex. App.CEl Paso 1993, orig.
proceeding).  Here, the fact issues to be
resolved relate to the ultimate issues in the case, not to the factors
governing the propriety of severance.





[14]The omissions that
initially prompted Abraham=s removal did not recur because Carol failed to
work her service plan and did not regain custody of Abraham.





[15]Carol testified that her
other children lived with a cousin while she was living at the Budget Inn.





[16]The caseworker testified
that Carol was on a waiting list for housing and was scheduled to get housing
the month after trial.





[17]Abraham had been found
wandering near the highway while in the care of a babysitter.  Dorothy contended that she had left Abraham
with her brother-in-law, an approved caregiver, but that he went to sleep,
leaving Abraham in the care of an unapproved caregiver.  The CASA advocate testified that Dorothy told
her she knew the brother-in-law was going to sleep and asked him to have the
unapproved caregiver watch Abraham.